JOSEPH J. LUNGHINO, Appellant, *v.* GEORGE F. RAND and Others, Respondents.

Fourth Department, March 25, 1936.

*Nevins & Nevins* [*Henry P. Nevins* of counsel], for the appellant.

*Kenefick, Cooke, Mitchell, Bass & Letchworth* [*James McC. Mitchell* of counsel; *William I. Morey* with him on the brief], for the respondents George F. Rand, George E. Becker, The Marine Trust Company of Buffalo, Fred L. H. Holzer, Joseph G. Fischer, Russell J. H. Hutton, J. Fred Schoellkopf, Jr., and May Perry Cooke, Carlton P. Cooke and The Marine Trust Company of Buffalo, as executors, etc., of Walter P. Cooke, deceased, Daniel J. Kenefick, Edward H. Letchworth, James McC. Mitchell, Lyman M. Bass, Christopher Baldy, individually and as members of the firm of Kenefick, Cooke, Mitchell, Bass & Letchworth.

*John J. Bennett, Jr.*, Attorney-General, by *Martin Conboy*, Special Assistant Attorney-General, [*David Asch* of counsel], for the respondents Joseph A. Broderick, George W. Egbert, Earl J. Bangert and C. George Niebank.

THOMPSON, J. Plaintiff appeals from a nonsuit and dismissal of the complaint at the close of his proofs.

He was president and principal shareholder of The Commercial Trust Company, a bank, and treasurer and principal shareholder in The Commercial Share Corporation, an investment affiliate of the bank, of the city of Buffalo, when, early in 1931, at the instance of the State Banking Department, the taking over of the assets and the assumption of the liabilities of the bank were effected by two contracts entered into by the bank with the Marine Trust Company of Buffalo. It is plaintiff's claim that the turning over of the bank's assets and business to the Marine Company was without legal or factual justification; that his consent to the contracts and his conduct in inducing other shareholders of the trust company stock to consent to them were procured by fear and coercion induced by threats made against him by the defendants, pursuant to a conspiracy designed to acquire the trust company for the Marine Company. Defendants are the officers of the State Banking Department, then in office, the Marine Company, its president, general counsel, and other officers and attorneys, the president of the trust company, who succeeded plaintiff, and its attorneys. For his damage, plaintiff alleges that the transfer of the assets and consequent closing of the trust company rendered his stock valueless.

The first contract between the trust company and the Marine Company was executed on January 22, 1931. Plaintiff, among holders of more than two-thirds of the stock, signed it, and he advised his associates to do the same. The second contract was made at the instance of plaintiff, with the advice of able counsel of his own choosing. He executed it on February 17, 1931. It provided for postponement of the winding up of the affairs of the bank for forty-five days in order that efforts might be made to obtain additional capital, reorganize or sell the trust company. The contract contained an express provision by which it " in all respects ratified, confirmed and continued in full force and effect " the provisions of the first contract. It too was approved by the favorable votes of holders of more than two-thirds of the stock of the trust company, including plaintiff. All the assets of the trust company were acquired by the Marine Company and the liquidation and settlement of its affairs was commenced at the close of the extended period; efforts to reorganize, sell or otherwise arrange the trust company affairs so that its liquidation might be avoded, being unavailing.

Plaintiff was the organizer and active head of the Commercial Trust Company. He was also the organizer and active head of the Commercial Share Corporation. This corporation was formed for the purpose of buying and selling securities. It was operated

by the trust company under a management contract. Its chief business was the purchase of securities, principally, with funds loaned to it by the trust company upon collateral, consisting almost entirely of the securities so purchased, and their sale, in some instances. It also loaned money in substantial amounts. Latterly its purchases and collateral were confined to stock of the trust company. Plaintiff also owned a one-half interest in S. Lunghino & Sons, a copartnership operating a private bank in Rochester, of which he was a managing agent.

From the time of the organization of the trust company in 1928 to the time of the contract of January 22, 1931, plaintiff had personally acquired and pledged a large number of shares of the trust company and the share corporation stock to secure loans to him of over $1,500,000.

An examination of the affairs of the bank made by the State Banking Department in the latter part of November, 1930, disclosed that the trust company had bought 10,742 shares of the share corporation stock at a cost of over $181,460. It had loaned the share corporation $1,540,000, exceeding the limit prescribed by law. (Banking Law, § 190, subd. 1, ¶ [c].) The share corporation used a large part of these moneys to purchase stock of the trust company and out of them it loaned the sum of $532,000 to plaintiff, which he used for the same purpose. The share corporation had expended $727,000 in the purchase of stock of the trust company, and had loaned on the stock of both corporations, as collateral, $651,000, of which $532,000 was loaned to plaintiff, as above stated. It had loaned $86,000 to S. Lunghino & Sons and, $65,300 to members of the Lunghino family. At that time, S. Lunghino & Sons had pledged all their assets to secure the payment of $243,000 of loans to them, except their cash on hand amounting to $3,763.94, credits in other banks of $3,636.31, bonds and mortgages having a face value of $102,450 covering properties owned by plaintiff or by corporations controlled by him, all but one of which were second mortgages, and on miscellaneous stocks valued at $2,167, 2,391 shares of trust company stock and 15,376.9 shares of the share corporation stock. Their deposits amounted to $277,778.52, and their capital was then found to be impaired to the extent of $88,882.49 by the representative of the Banking Department who made the examination. The share corporation had loaned plaintiff $532,000, principally collateralled by stock of the bank, and the trust company had loaned $383,970 on 33,398 shares of the share corporation stock. The report set the value of the trust company stock at less than sixty dollars a share, and of the share corporation stock at three dollars and twenty-three

cents a share. Plaintiff owned over forty per cent of the stock of the trust company and forty per cent of the share corporation stock substantially all of which was pledged as security for loans to him.

Plaintiff artificially maintained the market of the stock of the trust company at $130 per share, and the share corporation at fourteen dollars per share, by placing orders with brokers, in various names, at these prices, and causing the purchase of all the shares of stock offered for sale. The moneys used upon such purchases were all obtained directly or indirectly from the trust company and the share corporation. The Banking Department issued orders to stop this practice and to correct other unsatisfactory conditions of the trust company's affairs, which it found, but plaintiff refused to obey them. Meanwhile, it developed that plaintiff had caused the trust company to set up an account called the " Securities in Transit Account," and enter various amounts to its credit, upon which the trust company, at plaintiff's direction, issued treasurer's checks to brokers on the sale of the share corporation stock to customers, who did not pay for it, thereby violating the order of the Banking Department, and his promise that the trust company would discontinue the financing of purchases of the share corporation stock, as well as wrongfully depleting the assets of the trust company. At plaintiff's direction, the trust company issued its checks to brokers in payment of the share corporation stock bought on plaintiff's order, and charged the amounts thereon on its liability ledger to one Montesano, who gave his note with the purchased stock as security. Plaintiff gave his note to Montesano for the same amount, with the identical number of shares purchased as collateral. There were other similar transactions by plaintiff in the name of Montesano, so that it was with ample basis that the bank examiner reported that the sum of $62,185 appearing on the bank's books as a loan to Montesano was in fact a loan for plaintiff's benefit, and also that it was short collateralled. Again it appeared that plaintiff had caused sight drafts to be drawn against certain individuals in the total amount of $109,450 for the purchase of the share corporation stock; that he directed the amount of these drafts to be immediately entered as credits to his personal account in the trust company, and that by his further direction, the drafts were held, and not presented to the persons upon whom they were drawn. These transactions were not only against the explicit order of the Banking Department, and contrary to plaintiff's and the trust company's express agreement that " we are not to make any further commitments either by way of investment or loans

in Commercial Share Corporation stock, except that should we be obliged to take Commercial Share stock to bolster up an existing loan," but they effected the taking of the funds of the trust company without shadow of right or authority.

It was when confronted with this situation that the Superintendent of Banks issued ten written orders to the directors of the trust company, compliance with a part of which was required within twenty-four hours.

By these orders the trust company was required to reduce its loan to the share corporation to legal limits; obtain from the share corporation all its free assets as collateral to its loans; remove credits improperly given plaintiff in the amount of $109,450 for unaccepted sight drafts; remove the " Securities in Transit Account," amounting to $22,640; remove the Montesano loan in the sum of $72,169; pass resolutions against directly or indirectly using the moneys of the trust company or the share corporation to purchase the trust company or the share corporation stock; remove additional unaccepted drafts in the amount of $28,000; make good a $9,000 overdraft of plaintiff's account, and the Banking Department made an order that $250,000 in cash or securities of approximately that value, " be placed behind " the deposits of S. Lunghino & Sons. The trust company having failed to fulfill the requirements of these orders, the Banking Department arranged for a meeting of the officers and directors of the Marine Company and the trust company at the home of the defendant Rand, on the evening of January 21, 1931, for the purpose of turning over the assets of the trust company to the Marine Company for liquidation.

The facts above set forth are sufficient in themselves to answer plaintiff's challenge to the correctness of the conclusions reached by the Banking Department in its various examinations of the affairs of the trust company, the share corporation, S. Lunghino & Sons and plaintiff, and the necessity for the action it took.

We find no basis for criticism of the methods followed by the Banking Department in arriving at the value of the stocks and securities it had to appraise. Surely it could not have found the share corporation and the trust company stocks to be of the fictitious value that plaintiff had for a time been able to hold for them on the market by his own action in causing the purchase of all that was offered for sale at prices he dictated. The fixing of the real value of the bank's loans and discounts and the setting up of reserves in the amounts which the Banking Department found necessary were largely matters calling for the exercise of sound banking judgment, and it cannot be said that they were

arbitrarily or inaccurately done. The record includes no evidence which casts doubt on the determinations reached by the Banking Department in these respects.

The pegging of the market, so called, of both stocks, loans insufficiently collateralled, the spurious obtaining of credit for plaintiff of large amounts in the bank by the subterfuge of the sales of stock by the means of the sight drafts, the Montesano and securities in transit accounts, the defiance of the reasonable orders of the Banking Department, removal of collateral from the trust company to the share corporation, to raise money to buy the trust company stock, plaintiff's overdrafts, all these and other circumstances made it not only advisable but necessary that instant and drastic action be taken by the Banking Department in order that disaster might be avoided.

The Superintendent of Banks is an administrative officer, and he is vested with the power to liquidate banks. He may forthwith take possession of any banking institution that has violated its charter or any law, conducted its business in an unauthorized or unsafe manner, is in an unsound or unsafe condition to transact business, cannot with safety and expediency continue business, has an impairment of its capital, or neglects or refuses to comply with the terms of a duly issued order of the Superintendent. (Banking Law, § 57.) These powers necessarily include and impose upon the Superintendent the duty of instant decision and quick action in order that the moneys of depositors may be secured, and the interests of the stockholders subserved. He is authorized to " do all acts and to make such expenditures as in his judgment are necessary to conserve its assets and business." (Banking Law, § 69.) " He is not a part of the judicial branch of the government. He does not take his office nor derive any of his original powers from it. * * * It is not for the court to set itself above the judgment and discretion of administrative officers to whom the law commits a decision, for thereby the court but confronts its opinion with his opinion." (*Matter of Union Bank of Brooklyn*, 176 App. Div. 477, 481, 486, 487.) With this broad authority, the Superintendent of Banks is permitted to use any lawful method by which the failure of a bank may be averted (*Harriet State Bank* v. *Samels*, 164 Minn. 265; 204 N. W. 938, 941), and it is only where he has acted willfully, maliciously or corruptly that he can be held liable. (*Crayton* v. *Larabee*, 220 N. Y. 493.)

In view of these observations, it is clear that the facts in this case as testified to by plaintiff and his witnesses justify the action

of the Banking Department in every respect, and, furthermore, they completely negative the claim of wrongful acts on the part of any defendant. As already said, it was the duty of the Banking Department to bring about quick correction of the conditions it found. By the same token it became the duty of the officers and attorneys of the trust company, being charged with knowledge of the facts making up the real condition of the trust company and the determinations and orders of the Banking Department,. to advise and assist the trust company in a prompt compliance with the orders of the Banking Department, and to co-operate in the measures adopted, to the end that the moneys of the depositors might be saved. We find that the conduct of the Superintendent of Banks in method and in fact was proper and requisite in the situation in which he was called upon to act, and we fail to find evidence of fraud, deceit or other wrongful act on the part of the Banking Department or any of its officers, or of any other defendant, which in any way induced the liquidation of the trust company, or plaintiff to consent to and approve it.

The record presents no testimony from which an inference can be drawn that the banking institution which undertook to settle the affairs of this unfortunate bank, and gave its credit in doing so, acted with ulterior purpose or unworthy design, or in other than a fair and just manner. In no respect did it take advantage of the trust company. The facts and conditions that made it the duty of the Banking Department to take the steps which it did, furnish also a full warrant of authority and justification for the taking over and settling of the affairs of the trust company by the Marine Company. The actual condition of the trust company rendered it necessary that the Superintendent of Banks should take it over for liquidation, or that some other agency should be employed for the same purpose. The Banking Department proposed the two alternatives, and plaintiff and his associates chose the second.

We find no proof of wrongful act; hence there is no conspiracy here. (*Dalury* v. *Rezinas*, 183 App. Div. 456; affd., 229 N. Y. 513.) Plaintiff was not coerced, nor were his rights invaded in any respect.

The judgment should be affirmed, with costs.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Judgment affirmed, with costs.